Filed 2/20/24  In re P.B. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re P.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E081664 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J296380, J296381, J296382, J296383, J296384, J296385 & J296386) |
| v. | |
| W.B., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas Bunton, County Counsel, and Pamela J. Walls, Special Counsel, for Plaintiff and Respondent.

1

Defendant and appellant W.B. (father) and his ex-wife (mother) are the parents of nine children, seven of whom are minors subject to this dependency: I.B., Ja.B., L.B., Jo.B., G.B., H.B., and P.B. In March 2023, San Bernardino County Children and Family Services (CFS) detained the children based on allegations I.B. had forced two sisters, H.B. and P.B., to orally copulate him. The juvenile court declared the children dependents of the court, pursuant to Welfare and Institutions Code[1] section 300, et seq. Between the time of detention and the contested jurisdiction/disposition hearing, father engaged in unauthorized contact and made emotionally damaging statements. The court amended the allegations of the petitions to conform to proof that showed father presented a substantial risk of emotional harm to the children. Mother admitted, but father denied, the allegations. The court exercised dependency jurisdiction over the children and ordered supervised visitation for father.

Father challenges the sufficiency of the evidence to support the jurisdictional findings and orders (as to Ja.B., L.B. and Jo.B. only) and the imposition of supervised visitation for him only. We reject his challenges and affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

### A. Predetention Referral.

The parents separated and were living apart in 2019; on November 25, CFS received a referral involving domestic violence. During the investigation, father claimed he had seen I.B. (born July 2007) on his knees in front of two maternal teenage male

_____

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise noted.

cousins with their genitalia exposed, and I.B. had said there were multiple incidents where his cousins had inserted their penises into his mouth and/or buttocks. No dependency action was initiated because there was insufficient information to support the allegations.

*B. Detention.*

On March 13, 2023, CFS received an immediate response referral alleging I.B. had forced sisters H.B. (born June 2015) and P.B. (born November 2017) to orally copulate him on multiple occasions. When mother heard about the allegation, she seized I.B.'s cellphone and tablet, found videos of these sexual acts, and brought the children to the police station. H.B. and P.B. confirmed I.B.'s sexual abuse, and I.B. admitted to enticing the girls into performing oral sex on him. When asked if he had been touched inappropriately, I.B. stated that father had told him (I.B.) about an incident with his cousins but he was unsure what had happened. When the social worker interviewed father, he expressed surprise that mother contacted the police, claiming her family is a "hush hush family." Father was living at a church and requested custody of I.B.

The social worker opined the parents "are unable to protect the children from sexually inappropriate acts" since "the oral copulation was being performed while [they] were watching the children and did not have appropriate supervision for [them]." CFS did not support father's custody request because I.B. may have "access to various children at the church, where the father resides." A detention warrant was obtained, and the children were taken into protective custody. Jo.B. (born November 2011), L.B. (born February 2010), and Ja.B. (born November 2008; collectively the boys) were placed in

3

one confidential home, H.B., G.B. (born November 2013), and P.B. (collectively the girls) were placed in another, and I.B. was placed in a group home.

On March 16, 2023, CFS filed petitions on behalf of all seven children. P.B. and H.B.'s petitions allege the parents failed to protect them from I.B.'s sexual assault. (§ 300, subds. (b) & (d).) The boys' and G.B.'s petitions allege they are at risk of abuse because the parents failed to protect their siblings from sexual assault. (§ 300, subds. (b), (d), & (j).) I.B.'s petition alleges the parents failed to protect him from sexually abusing two siblings. (§ 300, subd. (b).) The juvenile court found the petitions' allegations true and detained the children. The parents were prohibited from discussing "the petition[s], [their] contents, the underlying facts or future placement with the [children] by the parents."

C. *Jurisdiction/Disposition.*

1. *Jurisdiction/disposition report and first addendum.*

According to the jurisdiction/disposition report filed April 4, 2023, and its addendum filed April 25, 2023, CFS requested a continuance to complete a more in-depth investigation of the allegations via interviews at the Children's Assessment Center (CAC). On March 29, 2023, the social worker interviewed mother who opined that (1) the assaults occurred when she was either at work or at the store, (2) I.B. took advantage of the siblings he knew would not say anything, and (3) she acted on behalf of the children's safety when she took them to the police station. Regarding father's claim that I.B. had been sexually assaulted by his cousins, mother stated the father initially said the cousins "had cornered [I.B.] and had their fists up," but later changed the story to

4

sexual abuse. She added that one of the children told her that father had said that "at least one child from a divorce household would go to Juvie." If the children were returned to her care, mother did not want I.B. around the girls.

In his interview on March 27, 2023, father asserted he should be able to trust his children and leave them alone in a room. He attributed I.B.'s use of his sister for pleasure to "the media" and pornography. Father opined that it all started in 2019 when mother was "doing her thing," i.e., working, and everyone "was having internet time." He denied failing to protect his children and said to prevent further abuse "he needs an understanding of spirituality in his home[, along with being] more committed in prayer with his family." Father claimed he was "not aware [I.B.] had been watching porn but on one of the times he took his phone, he did see a video search 'of big butts' but he thought nothing about it." He told the social worker that in the Christian world I.B. would be kept away until he was fully healed by "display[ing] the opposite character traits," such as "gentleness, kindness, love, peace in his heart, and being faithful to the church." Father "denied the sexual abuse allegations, but indicated the sexual abuse occurred behind the mother's back."

According to the police report, I.B. admitted he had his two siblings orally copulate him when his mother was not home, claimed he had been watching pornography since he was three or four, stated he acted upon his sexual thoughts, and acknowledged what he was doing was wrong. The social worker spoke with CAC's program manager who "expressed several concerns regarding [father.]" The group home social worker reported "the father's behavior appears as if he is afraid [I.B.] will say something. . . .

5

[He] has been asking the group home for daily updates, . . . reports, and [to] be informed of what is being discussed in therapy." She added, "[T]here [are] a lot of red flags with this case" because father knows information that he would not know unless I.B. informed him. Thus, she suspected father of communicating with I.B. by cell phone, adding he has not called the home to speak to his son. On April 18, 2023, father asked I.B. to "text him on his cell phone so they can play chess games." The group home social worker opined that I.B.'s "sexual abuse behavior was learned."

On April 12, 2023, the social worker informed father that he is not to have unsupervised contact with the children, including texting I.B. In response, father "presented combative" and stated, "[i]f the court has agreed to begin family reunification[, w]hy must we be monitored. Is that your choice, as the social worker in our case. Why did you reply to my text with a statement of policy. Are you working against us, not for us. Have you chosen to make it hard or help. Your behavior demonstrates your position." In contrast, when mother spoke with the social worker during a home assessment, she said she anticipates the children will be emotional and have questions when they return home. She planned to redirect them to their therapist or the court. During a conversation with father, mother shared ideas on how they can parent the children and ensure I.B. does not have contact with his female siblings; however, father replied, "We'll cross it when it comes." She explained that father "is struggling himself, he is no help, he cannot care for himself, and he has not financially helped" with the children.

The social worker reported that since CFS's involvement, mother appeared to be protective of the children, took appropriate steps to ensure their well-being, and was receptive to CFS's guidance; however, father was not equipped with the tools/skills to parent the children safely. CFS social workers and the staff at I.B.'s group home expressed concern about father's disregard of court orders and/or group home rules; they opined that his "combative behavior and lack of insight put him in the position that he needs further support from [CFS] before considering the return of the children to him." On April 25, 2023, Ja.B., L.B., Jo.B., G.B., H.B., and P.B. (collectively the six youngest children) returned to mother's custody, but father's visitation remained supervised. The jurisdiction/disposition hearing was continued to June 29, 2023.

2. *Second addendum to jurisdiction/disposition report.*

On June 1, 2023, CFS filed a second addendum report for the jurisdiction/disposition hearing wherein it recommended I.B. be removed from the parents (who should receive family reunification services) and the six youngest children be removed from father and remain with mother under family maintenance services. The six youngest children were living with mother, they were scheduled to begin family therapy, and father was referred for parenting classes and individual therapy. On May 25, 2023, I.B.'s group home expressed concern that father's behavior influences the child. For example, when the social worker met with I.B., he was defensive and told her, "'You get paid to be here.' [This] was a statement the father has told the minor before." She described father's talks with I.B. as a "'[w]eird dynamic of communication,'" and noted the two "have deep connection" and "know what to say/or not say when it comes to

7

working with professionals." Father told I.B. that "'corruption runs on your father's side[,]'" because one of his relatives had some violations, and I.B. confronted father "as to why it was reported he was suicidal when it was not true."

*3. Additional information 6.7 report.*

On June 29, 2023, the juvenile court received an additional information 6.7 report that stated father was working "Monday-Friday from 9:00-6:00" and asked the social worker to arrange visitation. He missed two visits and, when told that it is his responsibility to rescheduled them, he demanded unsupervised visitation begin. He complained about missing work on Wednesdays to attend classes, stating this is "very inconvenient for" him. Father was overheard telling I.B. that one of his adult sons attempted to kill mother; mother denied this and described father as the "puppet master" who influences I.B. by putting things in his head, i.e., that he would be criminally charged at the upcoming hearing. Thus, for father, CFS continued to recommend reunification services and supervised visitation, explaining unsupervised visitation was not yet in "the best interests of the children" because he needs to show "behaviorally specific ways that he would ensure the children from being re-abused."

*4. Contested Jurisdiction/disposition hearing.*

The contested jurisdiction/disposition hearing was held on June 29, 2023. Mother waived her right to a hearing and admitted the allegations. The parties agreed with returning the six youngest children to her under a family maintenance plan. Both parents submitted jurisdiction for I.B.'s petition to the juvenile court, but father objected to the allegations regarding the youngest six children, asking their petitions be dismissed and

8

stating he would testify for visitation as to disposition. Counsel for the six youngest children asked the court "not dismiss the petition[s, but] find father's allegations true. [She also asked the court] amend to proof regarding father's conduct." She explained that father's behavior since the sexual abuse puts the children at risk because he had told I.B. that there is a sex registrant on his side of the family and I.B. got his deviance from him. She argued that if father is saying the same thing to the six youngest children, then he's saying "this was natural and something that happened because other people in their family did this." County counsel agreed and joined in minors' counsel's statements. I.B.'s counsel submitted on both jurisdiction and disposition, and requested father's visitation remain supervised.

With respect to jurisdiction, the juvenile court ruled as follows: As to P.B.'s and H.B.'s petition, the court dismissed allegation (b)(1), but found allegations (b)(2), (d)(3), and (d)(4) true as amended; the amended allegations state the children had been sexually abused in father's custody and that his "behavior since disclosure place[d] the child[ren] at substantial risk of emotional abuse." As to the boys and G.B., the court dismissed allegations (b)(1) and (d)(3), but found allegations (b)(2), (d)(4), (j)(5) and (j)(6) true as amended to note "the risk of emotional abuse" as stated by counsel for the six youngest children. As to I.B., the court found allegations (b)(1) and (b)(2) true as amended to note "that father's conduct since disclosure places [I.B.] at further emotional risk of neglect."

At disposition, father requested unsupervised visitation with the six youngest children. He challenged the social worker's assertion that he demanded unsupervised visitation, claiming her "testimony is shrouded in a tone to always paint me to look bad."

9

He accused the social workers of always saying negative things about him, and alleged the paperwork reflects lies and "false statements about [his] behavior" and what he says and does. Despite being told not to discuss the case with I.B., father admitted that he confronted the child about getting in trouble and told him he "could be criminally charged if he doesn't stop misbehaving," i.e., using pornography, and he should read the social worker's report.

Citing *In re Jasmine G.* (2000) 82 Cal.App.4th 282, father's counsel argued that "it's not CFS's job or the state's job to come in and tell him how he needs to handle a situation that there's really no play book about how to handle it." Counsel asked that the six youngest children not be detained from father because there is no evidence of a substantial risk of harm.[2] In response, the children's counsel maintained that father's inappropriate statements to I.B. (sexual deviancy runs on his side of the family) placed those children at risk because they "are vulnerable . . . . If he says the same things he's saying to [I.B.] to these children, he's going to emotionally harm them. It's not speculation. It is a risk we see. It is a future risk." Regarding unsupervised visitation, counsel urged the court to consider that CFS returned the children to mother because she articulated plans how to protect the girls and make sure the abuse does not reoccur. Also, counsel asserted father crossed the line by talking to I.B. about the case. County counsel joined in minors' counsel's statements and asked the court to follow the recommendation. Counsel for I.B. asked that father's visits be supervised by CFS, not mother.

---

[2] Mother submitted "on the social worker's report and recommendation" with no further comments.

10

The juvenile court declared the children dependents, removed I.B. from both parents (with reunification services in place), removed the six youngest children from father and placed them in mother's custody (with family maintenance services in place), and ordered supervised visitation for father. The court found the social worker's reports more credible than father's testimony and agreed that father's conduct presented a "future risk to the younger children." Based on the "inappropriate" and "emotionally damaging" statements father made to I.B., the court was "very leery" of granting him any unsupervised visitation with the children.

## II. DISCUSSION

### A. Dependency Jurisdiction Over Ja.B., L.B., and Jo.B.

Father contends the juvenile court erred in asserting dependency jurisdiction over Ja.B., L.B., and Jo.B. because "there was no reasonable or credible evidence to show that they were abused or neglected, or were at substantial risk of abuse or neglect." He contends these children "were a different gender than those targeted by [I.B.], were old enough to protect themselves from [I.B.], and there was no 'violation of trust' by a parental figure as in *In re I.J.* (2013) 56 Cal.4th 766, 778 [(*I.J.*)]." Before discussing the merits of this issue, father contends he has standing to challenge the jurisdiction orders pertaining to these three children because mother's admission has no bearing on him.

### 1. Father's appeal should not be dismissed as moot.

"A court is tasked with the duty "to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions . . . ."" (*In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*).) "A case becomes moot when events

"'render[] it impossible for [a] court, if it should decide the case in favor of [appellant], to grant him any effect[ive] relief.'" [Citation.] For relief to be 'effective,' two requirements must be met. First, the [appellant] must complain of an ongoing harm. Second, the harm must be redressable or capable of being rectified by the outcome the [appellant] seeks. [Citation.]" (*Ibid.*) Thus, if we are unable to provide appellant with effective relief, the appeal is moot. In the dependency context, an appeal "is not moot where a jurisdictional finding affects parental custody rights [citation], curtails a parent's contact with his or her child [citation], or 'has resulted in [dispositional] orders which continue to adversely affect' a parent." (*Id.* at pp. 277-278.)

Here, CFS disagrees with father's contention, arguing his appeal must be dismissed as moot because whether he raises valid arguments challenging the juvenile court's jurisdictional findings and orders pertaining to him, the children remain dependents under the jurisdictional findings and orders pertaining to mother. We disagree. Since father has identified three dispositional orders—addressing both his custody and visitation of Ja.B., L.B., and Jo.B.—that would be impacted by reversal of the jurisdictional findings challenged on appeal, he has shown that this court can grant him effective relief. We therefore conclude his appeal should not be dismissed as moot.

2. *The juvenile court did not err in amending the petitions according to proof.*

Father faults the juvenile court for amending the petitions to indicate a risk of emotional abuse because (1) neither subdivision (a) nor (b)(1) of section 300 provide a basis for jurisdiction based on emotional harm, (2) the amendment goes "well beyond that which is permitted under the amend-to-proof doctrine," and (3) no evidence shows

that Ja.B., L.B., or Jo.B. were at risk of suffering emotional damage on account of the statements father made to I.B. "'[A]mendments to conform to proof are favored, and should not be denied unless the pleading as drafted prior to the proposed amendment would have misled the adversarial party to its prejudice.' [Citation.] Only if the variance between the petition and the proof offered at the jurisdictional hearing is so great that the parent is denied constitutionally adequate notice of the allegations against him or her should a juvenile court properly refuse to allow an amendment to conform to proof or should a reviewing court entertain a challenge to the sufficiency of the petition that was not raised below." (*In re David H*. (2008) 165 Cal.App.4th 1626, 1640.)

In response to father's request for "dismissal of the petition[s] as far as juris on the [six youngest] children," minors' counsel asked the allegations under section 300, subdivisions (d)[3] and (j)[4] be amended according to proof of father's conduct. Counsel pointed to the jurisdiction/disposition report that identified father's conduct and argued Ja.B., L.B., or Jo.B. "are also processing a lot because of this trauma and what they . . .

---

[3] "The father . . . has a history of placing the child's siblings, [P.B. and H.B.], at substantial risk of sexual abuse in that he has failed to provide adequate care and supervision of the child's siblings, [P.B. and H.B.], as the child's sibling, [I.B.], was having the children perform oral copulation to him, in the care and custody of the father. Such lack of supervision places this child . . . at substantial risk for further abuse and/or neglect."

[4] "The father . . . has a history of placing the child's siblings, [P.B. and H.B.], at substantial risk of sexual abuse in that he has failed to provide adequate care and supervision of the child's siblings, [P.B. and H.B.], as the child's sibling, [I.B.], was having the children perform oral copulation to him, in the care and custody of the father. Such lack of supervision places this child . . . at substantial risk for further abuse and/or neglect."

13

have now heard and read [in] the reports and have discovered what [I.B.] . . . has done to their sisters. [¶] I'm particularly concerned about father's conduct around the boys because if he is telling [I.B.] that this was a natural thing to happen because of things that happened in their family, what happens when he goes home to these boys and says that same thing. [¶] Now, these boys [have] never done anything to their sisters. They're processing everything that happened with [I.B.], . . . they're going to internalize things like that. It's going to . . . their emotional detriment. I think these are very dangerous statements to be saying to very vulnerable and volatile children. That is what I am asking to amend."

The original allegations the children were harmed by the parents' lack of supervision predated the amendment of the petitions and, arguably, include emotional harm: "Such lack of supervision places this child . . . at substantial risk for further abuse and/or neglect." Father's reliance on *In re G.B.* (2018) 28 Cal.App.5th 475 (*G.B.*) is misplaced. In that case, the Court of Appeal concluded the juvenile court erred "when, after dismissing all the allegations in the dependency petition, it crafted, added, and adjudicated jurisdiction allegations against him based on a factual and legal basis not at issue in the original petition." (*Id.* at p. 484.)

In *G.B.*, the petition alleged mother's boyfriend sexually abused G.B., and mother failed to protect the child. (*G.B.*, *supra*, 28 Cal.App.5th at p. 480.) At the jurisdiction hearing, the juvenile court found insufficient evidence to support the allegations. (*Id.* at p. 481.) Nonetheless, it amended the petition on its own motion to include allegations against the father after concluding he had coached the child to fabricate the accusations

14

against mother and her boyfriend and continued the hearing to allow father time to respond. (*Id*. at pp. 480-481.) Over father's objection, the court stated it had "'authority to amend according to proof and to find a non-offending parent offending.'" (*Id*. at p. 482.) The Court of Appeal disagreed, concluding the amended allegations changed the grounds for establishing jurisdiction over the child: "Specifically, the court's allegations sought to establish jurisdiction over G.B. under a different legal theory than the original allegations (emotional abuse versus sexual abuse); they named father as an offending parent even though he was nonoffending in the original petition; and they were based on a set of facts not at issue in the original allegations (father's alleged coaching of G.B. to fabricate allegations against mother and her boyfriend versus the boyfriend's alleged sexual abuse and mother's failure to protect G.B. against that abuse)." (*Id.* at p. 486.)

In contrast to *G.B.*, the factual content of the allegations in this case remains unchanged. The conduct of father—failure "to provide adequate care and supervision"—and the "risk of further abuse and/or neglect" were included in the original allegations, and the jurisdiction/disposition report and addendums repeatedly noted CFS's concerns about father's conduct around the children, as evidenced by his disregard of court orders and/or group home rules via unsupervised communication with I.B., minimization of I.B.'s actions because "'corruption runs on [father's] side'" of the family, and combative behavior with social workers. Moreover, minors' counsel requested the amendment, and father had the opportunity to challenge the amendment by presenting additional evidence and/or argument. Instead, father's counsel stated father would testify for visitation as to

15

disposition, otherwise, he asked the juvenile court to make findings on jurisdiction.  We conclude the gravamen of the dependency petitions remained the same.

*3. Sufficient evidence supports the jurisdictional findings and orders.*

Father contends the evidence that I.B. sexually abused his younger sisters does not support the juvenile court's finding that his sons (Ja.B., L.B., and Jo.B.) are dependents of the court under section 300, subdivisions (d) and (j).

"'The purpose of California's dependency law is "to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." [Citation.] In its effort to achieve this overarching goal, the law balances a number of vital interests: children's interests in safe and stable homes; parents' interests in raising their children; families' shared interests in each other's companionship; and the state's interest in protecting society's most vulnerable members.' [Citation.] [¶] 'Dependency proceedings span up to four stages:  jurisdiction, disposition, reunification, and permanency.  [Citations.]  At the jurisdictional stage, the juvenile court determines whether to declare a child a dependent of the court because the child is suffering, or at risk of suffering, significant harm.' [Citation.]  '"A dependency adjudication is a preliminary step that allows the juvenile court, within specified limits, to assert supervision over the endangered child's care." [Citation.]  After the juvenile court takes that preliminary step, the court may impose limitations on parental authority as necessary to protect the child.  [Citations.]  It may also order that the child be removed from a

16

parent's physical custody if there is clear and convincing evidence that removal is necessary to protect the child from a substantial risk of harm. [Citations.] In some cases, a dependency adjudication may lead to termination of parental rights.' [Citation.]" (*In re N.R.* (2023) 15 Cal.5th 520, 537.)

Relevant to this case, the juvenile court may adjudge the children to be dependents of the court under Welfare and Institutions Code section 300, subdivision (b)(1)(A) ("there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of [¶] [t]he failure or inability of the child's parent . . . to adequately supervise or protect the child"); subdivision (d) ("there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by . . . a member of the child's household"); and subdivision (j) ("The child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions"). Father admits the court properly exercised jurisdiction over H.B., P.B., and G.B. under subdivision (d), but asserts the "theory of risk did not logically extend to [the] older boys who were differently situated." We apply the substantial evidence test to the juvenile court's jurisdictional findings. (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.)

We agree there is no evidence that I.B. sexually abused his male siblings; however, section 300 does not require that a child actually be abused or neglected before the juvenile court may assume jurisdiction. "The subdivisions at issue here require only a 'substantial risk' that the child will be abused or neglected. The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children

17

who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm.' [Citation.] 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.] [¶] 'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.] Subdivision (j) of section 300 is the one that most closely describes the situation regarding the boys. Accordingly, we will focus on that subdivision." (*I.J.*, *supra*, 56 Cal.4th at pp. 773-774.)

Subdivision (j) applies if (1) the child's sibling has been abused or neglected as defined in specified other subdivisions, and (2) there is a substantial risk that the child will be abused or neglected as defined in those subdivisions. (§ 300, subd. (j).) Here, I.B. sexually abused the boys' sisters as defined in subdivision (d). So, the first requirement is met. At issue is the second requirement. "'[S]ubdivision (j) was intended to expand the grounds for the exercise of jurisdiction as to children whose sibling has been abused or neglected as defined in section 300, subdivision (a), (b), (d), (e), or (i). Subdivision (j) does not state that its application is limited to the risk that the child will be abused or neglected as defined in the same subdivision that describes the abuse or

18

neglect of the sibling. Rather, subdivision (j) directs the [juvenile] court to consider whether there is a substantial risk that the child will be harmed under subdivision (a), (b), (d), (e) or (i) of section 300, notwithstanding which of those subdivisions describes the child's sibling.' [Citation.]

"Unlike the other subdivisions, subdivision (j) includes a list of factors for the court to consider: 'The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child.' [Citation.] 'The "nature of the abuse or neglect of the sibling" is only one of many factors that the court is to consider in assessing whether the child is at risk of abuse or neglect in the family home. Subdivision (j) thus allows the court to take into consideration factors that might not be determinative if the court were adjudicating a petition filed directly under one of those subdivisions. [¶] The broad language of subdivision (j) clearly indicates that the [juvenile] court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the subdivisions enumerated in subdivision (j). The provision thus accords the [juvenile] court greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance.' [Citation.]" (*I.J.*, *supra*, 56 Cal.4th at p. 774.)

Here, the juvenile court was presented with sufficient evidence that father's conduct presented a substantial risk of emotional harm (per the amended allegations), abuse, or neglect if the boys were returned to his custody. Because the parents' failed to supervise or protect the children, I.B. sexually abused two of his sisters. Although it is unclear when the abuse occurred, the evidence shows that mother was working full time outside the home while father was tasked with homeschooling the children. Upon CFS's detention of the children in March 2023, father asserted he should be able to trust his children and leave them alone in a room. During the next three months, he continued to downplay the gravity of the situation and thwart the system by disregarding court orders and/or group home rules, engaging in unsupervised communication with I.B., minimizing I.B.'s actions because "corruption runs on [his] side" of the family, and exhibiting combative behavior with the social workers. Based on this evidence, we conclude the court correctly assumed jurisdiction over, and took steps to protect the boys under section 300, subdivision (j).

## B. *Supervised Visitation.*

Finally, father contends the juvenile court erred when it ordered supervised visitation with his children. Relying on the same reasons used to support his prior arguments, he asserts that "during a time when the younger six children needed their father the most and were accustomed to being homeschooled by father on a daily basis, the decision to impose supervised visitation . . . exceeded the bounds of reason." We review a visitation order for abuse of discretion. (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557-1558.) There was no abuse of discretion here.

20

As previously discussed, father violated both court orders and/or group home rules via unsupervised communication with I.B., he minimized I.B.'s actions because "corruption runs on [father's] side" of the family, and he exhibited combative behavior with social workers. On April 25, 2023, prior to the disposition hearing, the juvenile court advised father as follows: "[T]he way you're going to get to unsupervised, which I'm inclined to give you if you get involved in everything and follow the Court orders, is to simply do that; follow my orders. Don't contact the kids except for your supervised visitation. Don't discuss the case in any way with the kids[, e]nroll in the services you've been given referrals for[, a]nd cooperate with the social worker." Nonetheless, father persisted in "making inappropriate and emotionally damaging statements to [I.B.], . . . [and] violating [the] Court's orders." Thus, the court was "very leery of any unsupervised contact with the younger children." Considering the evidence, father failed to establish the court abused its discretion in ordering supervised visitation.

## IV. DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

RAPHAEL
J.

21